Now we'll hear arguments in the case of Native Village v. ExxonMobil. Council? I'd like to reserve two minutes of my time, if I may. Certainly. May it please the Court, Matt Powa for Plaintiff's Appellant's Native Village of Kivalina and the City of Kivalina. I'm joined at council table by Brent Newell of the Center on Race, Poverty, and the Environment and Heather Kendall of the Native American Rights Fund. We're also joined today by eight elected officials from the Kivalina Tribal and City Councils. This case presents the question of whether a federally recognized Native American tribe and Alaskan municipality may proceed past the pleading stage with their damages lawsuit, lawsuit seeking damages from defendants for their significant emissions of greenhouse gases and for the conspiratorial actions of some of those same defendants whom we allege engaged in agreement to continue their tortious conduct. There's a fundamental principle of public nuisance law that underlies this case and that's essential to resolving the questions of displacement and political question. And that principle is that when you sue in public nuisance for a damages case, particularly one seeking damages for severe harm, you don't need to engage in a balancing of the utility of the defendant's conduct against the harm to the plaintiff. That's an injunctive relief test and it doesn't apply in a damages case, particularly one like this seeking damages for severe harm. Rather, the focus of the unreasonableness element of public nuisance shifts from a focus on the defendant's conduct in an injunctive case to a focus on the harm to the plaintiff and whether the plaintiff should be required to continue to endure and bear that harm without compensation. It's not a, there's not a strict liability standard here. There's some evaluation made. Doesn't that evaluation inherently involve the balancing you claim doesn't exist? With respect, Your Honor, it doesn't require that balancing because the intentionality aspect of nuisance, we've alleged an intentional nuisance, requires looking at whether or not the defendant knew of the harmful nature of its conduct and declined to refrain from continuing that conduct. And so it's not a strict liability, whereas defendants have really misphrased it, an absolute liability to it. It's not. It requires intentionality and that, and a protection for the defendants, and they can put on evidence on that point. This does not. What exactly do you have to prove? If you were instructing the jury on the elements, then how would you, how would you couch those elements on your common law public nuisance claim for damages? What would the elements of that be? The elements would be an intentional interference that is unreasonable with the plaintiff's rights and whether those rights are common to the general public. So we'd have to prove, and the jury would have to agree, that they emit significant quantities of greenhouse gases, that they knew of the, that those combine with the emissions of others in order to cause the harm, that those emissions are large enough not to be trivial within Section 36 of the Restatement Third of Tort, which would make very small polluters non-liable, and whether or not there was severe harm, so severe to the plaintiff, the plaintiff should not be required to endure it any longer without compensation. So that's, that's in a nutshell Section 829A of the Restatement of Torts. It's Prosser and Keaton. It's a host of cases that we've cited in our briefs and other authorities. And we submit, Your Honors, respectfully, that it's black-letter law. And that's why the ---- Well, global warming, Judge Clifton, does definitely present new facts, but so have over the years many other cases. And ---- What's your closest analogy? You know, the one that I like to point to the most is California v. Gold, Run, Ditch and Mine, which is a 19th century public nuisance case where the defendants basically came into court and said, Your Honors, you could, they were water polluters and there was a very small subset, just one polluter that was sued, and it was conceded that there was a vast number of other polluters who were contributing to the pollution of the river. There was actually some natural sources of the sediment going to the river, too. And the defendants basically came into court and said, you could shut us down tomorrow. It wouldn't make any difference because there's so many others who contribute. And the court said, that doesn't matter because you contribute and you're the largest polluter on this river, and from that point forward, Your Honor, became a point of public nuisance law that's now enshrined in the Restatement of Torts, the contribution principle, that each polluter's pollution standing alone need not cause the nuisance and need not cause all of the plaintiff's harm. And this has become Section 433B of the Restatement of Torts. Scalia. Well, but is there some, I mean, talking about a stream, a discrete zone or geographic location, a discrete number of polluters who are dumping whatever into a stream is one thing. Here we're talking about global warming. And the defendants, as active as plaintiffs may contend they are in terms of greenhouse gas emissions, contextually, what is going to have to go into that amalgam of factors in determining whether their role is meaningful? Well, as in other prior multiple polluter cases, the defendants will have the opportunity to try to argue that their contribution is too small. But as a point of law, what they can't do is argue that my contributions alone wouldn't cause the nuisance. It's black-letter law that that is not a defense. And we would, you know, there have been a discreteness to many prior nuisance cases because of the facts. But now defendants have figured out a new and novel way to pollute the global environment with discrete impacts on particular plaintiffs located in discrete of them do out of these very same smokestacks and causing acid rain over a very large swath of territory, which I think is undisputed. We all know that happens. Would you say that one particular town or people who own property in one particular lake affected by this very large area of acid rain would have no cause of action because it was too spread out? Clearly that can't be the rule of law. Perhaps not, but there is an element of traceability that exists in acid rain cases that is more difficult to see in this case. In all of these pollution cases, Your Honor, going back well over 100 years, you can't trace molecules. Well, that's true. But in this case, it seems we were taking it to the extreme in the sense that your argument is that any polluter anywhere in the globe can contribute to global warming and therefore cause these effects. So when I drive my car, when I drove down to the courthouse today, ostensibly I should join the defendants, I suspect, under your theory. Your Honor, you know, the defendants make this argument that under our theory everyone in the world would be liable for global warming. It's not true. First of all, the law has two ways of dealing with this problem. First, there's the Trivial Contributor Rule, which is Section 36 of the Restatement Third of Torts, which says that if you're a trivial contributor to a harm, you're not liable. And also Section 840E, Comment B of the Restatement of Torts and Crosser and Keaton talk about this issue in the context of a multiple polluter case, and they look to the knowledge of the defendant and the fact that the defendant knows that their omissions are combining with those of others to create harm. Scalia. What are the manageable, I think the term of art, judicially discoverable and manageable standards that the Court would be called upon to apply in resolving the elements of your claim? Not everyone in the world, trivial, we can accept that 7 billion people contribute in some fashion, perhaps, however infinitesimal, but what would the standards be? How would we draw that line as to those who should be liable because they contribute in a meaningful way to the consequences that your clients allege they're suffering and those who are not? On the plaintiff's side, you know, we don't think that this case calls for a determination of the outer limits of who would be able to bring a case, if I'm getting at the question, because the special injury rule of public nuisance has always served to weeded out those who can and can't bring a public nuisance claim. This Court applied that principle in maritime law in the Exxon Valdez case. And on the defendant's side, I think that the trivial contributor rule would fully protect the defendants in district court, and they would have an opportunity to try to demonstrate that they, too, are like the average car driver and their clients are liable. They'll have that opportunity. They'll also have the opportunity under Section 433B to try to show that their liability is several only and that they should only be responsible for their proportionate share. I believe there was a question. Well, let's take, for example, parsing this out a bit, let's take Peabody. Peabody does not itself do any generation. It simply mines the coal and it sells the coal. And I think in your pleadings you may you allege there's a subsidiary, but the subsidiary is simply a marketer of energy. How does your theory apply to Peabody, a non-generator? Well, two responses, Your Honor. First, it applies to them because we have alleged that they emit methane directly from their mines, which is a very potent greenhouse gas, 20 times more powerful than carbon dioxide. So we have them on the hook, as it were, as a direct emitter, according to our complaint. And we also have a theory that is similar to the gun cases that this Court expounded upon in Ailito v. Glock, some of which sounded in public nuisance. And, yes, there was an intervening actor who was pulling the trigger, but there was an inevitability to the way in which guns were marketed or used. And so some of those cases were allowed to go forward under a theory of public nuisance. And so that's, with respect to Peabody, how we would proceed, basically two theories. I want to return to, obviously, displacement is an incredibly important issue here. And the fact that it's black-letter law, that there's no balancing in a damages case, seeking damages for severe harm, means that we won't be putting a Federal District Court judge in the position of doing the same thing as the EPA, weighing the costs and benefits of alternative energy versus fossil fuels and deciding what emissions limits should have been at any particular time. That's not necessary here under the elements. Our claim does not ask what the emissions levels should have been at any particular time. I just observe you're taking that as a given. Rest assured that at least one judge doesn't take that as a given. I'm entirely unpersuaded that reasonableness is not part of the balancing to be done. And I don't know why you're telling me it's black-letter law that isn't. Well, because I read it in Section 829A of the Restatement of Torts, and there's a series of cases under State law. I'm reading comment E that talks about reasonableness being an element in all of them. The reasonableness clearly shifts. Some aspect of the concept of unreasonableness is to be found in each of the categories. Oh, is this Section 826? No. 821A, comment B, comment E. Right. And if you look at 829A, there's alternative tests that apply in different kinds of circumstances. And the courts, State courts, for example, that have been hearing cases of severe harm, like the Wisconsin court hearing the Jost case or Emerald Mines in the North Coast, that when you have a plaintiff whose property is being severely harmed by the defendant, it's the pollution and the conduct is not a license to harm, even though under a balancing test you might let it continue. But it's unreasonable not to compensate the plaintiff. And the plaintiff here is being completely wiped out. And under that law, it's very clear that the plaintiff need not demonstrate that the value of Kivalina is greater than the value of fossil fuels. I mean, I think it's clear it's not. And in those other cases, it's not been held to be a defense, because sometimes courts are faced with this problem that you'll have a farm that's, for example, that's worth not a lot of money next to a utility, the Jost case, that's worth a whole lot of money and the value of what they're doing. And the courts say this isn't a license to keep going. And so when we ask if it's unreasonable, the question is, is it unreasonable for the plaintiff to have to continue to endure this harm without compensation? Are you really asking us to, you know, this case has a discrete harm to a discrete set of plaintiffs, and it's genuine. There's obviously difficulty that is being faced in terms of relocation of their village. But the logical extension, the context of this case, if we just look at it as that case, but if we put it in context, are you really asking for the equivalent, de facto, injunctive relief? I mean, wouldn't there be other plaintiffs that similarly situated plaintiffs that would face the same kind or bring the same kinds of suits potentially or logically? And wouldn't that basically render the equivalent of an injunction against the prohibitory injunctive? It would not be, Your Honor. And in fact, one of the alternative tests that the Court can apply under public liability is to ask whether or not the defendant could stay in business and afford to compensate other similarly situated plaintiffs. So that would be a fair factual question for the jury under that test, if that's the one that's held to be applicable. And there might be other plaintiffs, although I tend to doubt that there's going  to be other plaintiffs who are, you know, governmental plaintiffs like we have that have to move the entire town out of harm's way. It's a pretty unusual fact pattern. And you're also dealing with a part of the planet, the northern, extreme northern latitudes, that are uniquely affected by global warming. There's a lot more warming up there. The plaintiffs in Comer wouldn't agree with you on that. They may not, indeed. And, you know, they have an argument that, you know, under the facts that they're also harmed by global warming. So there may have to be some analysis of that. But that's a factual question for the jury. And it doesn't mean that we don't get into court, and it never has in a public nuisance case. We want to point out on the displacement test that there's been some cases out there that have defined controlling case law that defines the displacement test narrowly, particularly the Oneida Indian Nation case, in which a Federal common law claim by a Native American tribe for ejectment seeking damages was allowed to coexist with a statutory scheme that created a prospective remedy in which the President could forcibly remove illegal occupants of Native American land. And in Oneida Indian Nation, the Court literally emphasized the words directly and particularly in talking about the narrowness of this test and said that the test is whether Congress has directly addressed the particular question. In AEP itself, the Court referenced this Oneida Indian Nation case and said that the reach of remedial provisions is important to the determination whether a statute that displaces Federal common law. And in the Exxon shipping case, the Court also allowed a common law damages claim to coexist with a statute, the Clean Water Act, that completely occupied the field in terms of injunctive remedies. And this Court in the Casa v. Browner case, which wasn't cited in the briefs but probably should have been KASZA 1998, also allowed a Federal claim, Federal common law, in that case defense, to coexist with a statutory RCRA defense. I'm almost out of time. There's one point that was not made in the briefs with respect to standing that I'd like to touch on briefly. And that is our case, standing is much easier than it was in Massachusetts v. EPA for the following reason. We've sued the polluters directly. And Massachusetts sued the government for its failure to regulate third parties. And that's why Massachusetts arguably needed the boost to its standing that comes from a statutory claim or the fact that there was special solicitude for the sovereign. And the key case on this is Lujan v. Defenders of Wildlife, which holds that when one sues the government for its regulation or failure to regulate a third party, standing is, quote, substantially more difficult. That was Massachusetts' problem and perhaps why they needed the benefits they got in that case in the standing analysis. We don't need that benefit, Your Honors, because we've sued the polluters directly. What kind of traceability? Because you're right, under Lujan, the fairly traceable component of that. And your second assignment of error in your brief states essentially that the district court erred based on an inaccurate belief that Article III standing requires Kivalina to trace pollution molecules back to individual defendants. Was that really what was ---- With respect, I believe that was the upshot of the district court's ruling. I mean, she said we couldn't prove that any particular defendant, for example, was the seed of our injury, a seed of the injury test that this court has never applied. But the upshot was essentially saying you can't show that it was so-and-so's molecules and not so-and-so's. Or another way to interpret the district court's opinion is you have to show that their contribution standing alone would have caused the nuisance, would have caused the harm. And when you do that, you're raising the standing hurdle higher than is required for success on the merits under this contribution principle that I've discussed that goes back to the 19th century at least. And under Laid Law, U.S. Supreme Court said you can't raise the standing hurdle higher than is required for success on the merits. You've got Massachusetts v. EPA accepting standing in a global warming case that says you basically don't have to trace molecules. You've got the Second Circuit in Connecticut v. AEP, a decision which was not disturbed by the 4-4 tie in the U.S. Supreme Court. And you've got the Comer Panel opinion, which, of course, was vacated en banc on procedural grounds. But nonetheless, it's a good indication of how three Federal appellate judges viewed the standing issue, which is the same issue here. And so we would submit that the district court did err on that basis. I see that I'm out of time, and I'll save my two minutes. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Daniel Collins, Munger, Tolson, Olson, on behalf of the defendant, Appellese, in this case. I'd like to begin by pointing out that it is not, in fact, black letter law, that there is no balancing, no consideration of competing concerns in the public right. For example, the public right is a very important element in any nuisance analysis. If you look at Comment E to Section 821B of the Restatement, it says, in each of these categories, and I'm referring to intentional or reckless conduct, negligent conduct, some aspect of the concept of unreasonableness is to be found. If the interference with the public right is intentional, it must also be unreasonable. So it's not just is there a severe harm and was it intentional. It is a – there is a reasonableness factor here. It requires a consideration of competing and countervailing considerations. And the decision in AEP confirms that because, as the Supreme Court said in that case, it said that determining in the first instance what amount of carbon dioxide emissions is, quote, unreasonable is an exercise that the court called one of complex balancing that would require consideration of competing considerations. They identified whether the particular greenhouse gas producing sector at issue, the concerns that it implicates, as well as would require an informed assessment of competing interests, including our nation's energy needs and the possibility of economic disruption. So it would, in fact, involve a balancing, and it would be a balancing that is on a scale that is utterly without precedent, as the district court noted. The AEP case obviously involved injunctive relief, and so the assessment of what's to be permitted and what's not inevitably involves that kind of balancing. The plaintiff's contention here is that a claim for damages does not require that. Why do you contend that it does in a claim for damages? Because the focus of the balancing in a damages case, at least if you follow the restatement and for purposes of the argument, we're assuming arguendo, that that is applicable as they claim, the balancing shifts, but it remains a balancing. So the question may shift from whether or not the conduct is reasonable in general to whether the conduct is, it is reasonable to permit the conduct to continue without compensation. And it introduces other factors, such as whether or not the imposition of liability not just on this person, but of that type, would render these kinds of conduct infeasible and the implications of that. So it still remains a balancing test. It might be slightly shifted and it's focused in a damages case or one involving severe harm as discussed in Sections 826 and 829A of the restatement, as we've explained that in our brief. But it introduces a scale of balancing that is just beyond any precedent, as the district court noted, and that's what gives rise to the political questions. Well, the magnitude is unquestionably great, but is the balancing that's called for in that context of intentional, reckless, negligent conduct something that's unheard of in tort law? Are, in fact, finders called upon, alt juries called upon all the time to do that? Here it's huge, but does that take it out of the realm of something that's manageable within the standards of litigation? It does in the two respects that the district court identified. The first in that it involves not just looking at a context in which we have a factory that's polluting a stream and affecting nearby neighbors, and it's a very discreet analysis. Here it is projected onto a literally a worldwide forum with worldwide implications, national and international interests, of a scale that is not just different in kind but different in degree by several orders of magnitude. Nothing of this scale has ever been remitted to a court for decision. And in both Massachusetts v. EPA, and then again in AEP, the Court affirmed that it – that these were not the kinds of inquiries that judges were well suited to conduct, even though it didn't reach the political question issue specifically. And then there's the further question of how would you possibly create a system for allocating fault, pairing up particular persons with particular harms. That was the further political question that she identified. There's also the issue of standing here. And on the question of standing, the district court correctly identified that this was a context in which the fair traceability standard was not being applied, but rather traceability would essentially be eliminated. This is fair traceability without the traceability. This Court said in the Pacific Lumber case, and it was paraphrasing the same sentiment expressed by the Supreme Court in the Lujan and Simon cases, that, quote, the issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct rather than to that of some other actor not before the court. This aspect of there being something distinctive or differential that says that my harm is connected to your conduct as opposed to the conduct of others, that's what is missing here. It's missing essentially by concession. So what do we make of the AEP case? I mean, it's in an odd posture because it was a 4-4 affirmance, but the standing aspect of AEP was affirmed. So do you distinguish AEP? Do you think that we are different from the situation that the Second Circuit faced? I think it's different in two respects. First, the – when the Court expressed its division 4-4, what it said with respect to those who would have sustained standing was that they agreed that at least some of the plaintiffs had standing, and they cited the portion of Massachusetts that said that the State had standing there. So the suggestion is that because it was a State plaintiff in AEP, as it was in Massachusetts, the special deference holding of Massachusetts was what accounted for those four votes. We don't have that here. This is not a State plaintiff, and it's not entitled to the special solicitude. Well, assuming for the sake of the argument that they are sovereign and entitled to the same status, then how do you distinguish AEP on the merits on traceability as opposed to the status of the particular plaintiff? Well, I think that the – I don't want to just depart. No, but I'm – you started off on traceability, and I'm interested in that aspect of your argument. Given AEP's acceptance of traceability, at least in some fashion, what implications does that have for this case? The second critical aspect, and the Court relied on the combination of both of them, was the fact that it was a statutorily created procedural right that was at issue in Massachusetts, and it is the combination of those two that the Court identifies on page 520 of the decision as warranting the special solicitude in the standing analysis. It did not suggest that just the fact that it was a State plaintiff, but it was a State plaintiff, it was a State plaintiff, is not a claim to a procedural right that had been created by Congress in the – in the Clean Air Act. But it's not – Kivalina, because it has no territorial sovereignty, is not a – is not a plaintiff that's entitled to special solicitude. It doesn't have the status. That was an essential element of that prong of Massachusetts v. EPA because the Court said – referenced the fact that it was a case in which Massachusetts was attempting to preserve its sovereign territory. That was the phrase that the Court used. There is no sovereign territory here because under the Alaska Claims Settlement Act, the territory here is not, in fact, sovereign territory. It's held by a State-chartered corporation. So that essential feature of Massachusetts is missing here. With respect to traceability, they rely on analogies to a set of cases that, in fact, prove that this case lacks fair traceability, which is the Clean Water Act cases, which rely on the presumption of injury that comes from a violation of a permit level and geographic proximity. And the geographic proximity is particularly telling because the Fifth Circuit in the Crown Central case, the Seventh Circuit in Texas Independent, and the Fourth Circuit in Gaston Copper all recognize that when you go beyond a certain distance, the threat of traceability is lost. And the intuition in those cases, as well as in the common law cases they rely on, is, you know, when you have 26 people putting sludge into a river and it goes downstream, some of the sludge that lands on the plaintiff's property downstream came from each of the 26. And indeed, if you look at the Powell-Dufferin case in Footnote 8, that is, in fact, what it hinges on, that some of the injury is traceable to that defendant when it establishes that standard. That's missing here, and it's missing by concession. That line is, as those cases recognize in enforcing that geographic proximity line, a constitutional line for purposes of Article III. But beyond all these problems, we have the dispositive issue of displacement decided by the Supreme Court in AEP because it is primarily the office of Congress and not the Federal courts to prescribe national policy. Scalia, in the context of injunctive relief being. In the context of injunctive relief. Right. However, the Supreme Court said in the Sea Clamors case that where you have a displacement of Federal common law remedies in the injunctive context, as it had in Milwaukee 2, that extends to and applies to and displaces damages remedy. That was a holding of Sea Clamors. I think if you combine AEP. So how do you explain the Valdez case? I think the Valdez case does, in fact, rest, contrary to what they claim, on the fact that it was a maritime case, and there also was a concession in the case. The Court was confronted with a very narrow question. The concession was made that the compensatory claims were not displaced. And the only argument was a narrow one, that punitive claims were displaced. And the Court said, well, we can't find anything that's going to support that kind of distinction in any of the congressional enactments that would suggest that kind of an intent. So your argument is that Exxon didn't reach the question? No. I think that the fact that it was maritime was critical. And this Court's opinion that was reviewed in that case made precisely that point. At 270 F. 3rd, 1231, this Court said the reason Exxon does not argue that the plaintiff's recovery in this case at bar is on a common-law nuisance theory. The reason this distinction makes a difference is that, as the Supreme Court explained in Milwaukee, a nuisance theory would enable a Federal district judge to substitute a different balancing of interests from the one made by the agency to which Congress assigned the job. And that's exactly right as to why the maritime issue that the Supreme Court reached is different from the nuisance question here. There are two respects in which there is displacement, and the question has been given to a regulatory structure that exists under the Clean Air Act. And it's that delegation into that regulatory structure of the Clean Air Act that makes the difference. So there's two respects. First is precisely what this Court had suggested in Exxon Valdez, that it would have Federal judges on an ad hoc basis doing exactly the kind of balancing that Congress, under the aegis of the Clean Air Act and consistent with its requirements, has remitted to an agency applying those standards in accordance with that act. That's one respect. The second respect is with respect to the issue of remedies. The Clean Air Act establishes, under Mass v. EPA and under AEP, it establishes the framework for when, whether there will be regulation and under what circumstances and with what remedies. And the remedies point is one that Congress made a decision in the Clean Air Act. And if you look at the Sea Clambers case, the Court, its discussion of the displacement issue at the end of its opinion is relatively abbreviated because it follows on the context of a longer discussion in which the Court said that there was no implied right of action under the Clean Water Act in that case. And having said that, it then was fairly easy to conclude that any question of a Federal common law damages remedy had been displaced. So to here, the Clean Air Act omits any kind of compensatory damages remedy under Federal law. Congress created the Federal remedies within this structure that it wanted, and it's not appropriate under Federal common law to second-guess Congress's reticulation of what kind of structure it wanted with what kind of remedies and instead say there will be, you know, a different kind of balancing with different kinds of remedies. That displacement holding is dispositive of this case. Was that argument addressed in Comer? I don't recall. In the Comer case, the Fifth Circuit case? Comer does not address the panel opinion in Comer did not address the question of displacement of Federal common law directly. There is some reference in the panel's opinion to the issue of preemption, although I don't believe even there that that's a – was a square holding, because the claims were ambiguously pleaded, but as they were presented to the Fifth Circuit, they were on Mississippi State law and not on Federal common law. And so here we have the converse. This case is exactly like the Sea Climbers case, where the State law claims had been in the case. So it's just the Federal common law cases and the Federal common law claims. And so in that respect, the displacement holding of AEP alone would be completely dispositive of this case. In your briefing, in some of the briefing, there's a discussion of the Iqbal plausibility standard with regard to the complaint plaintiffs have filed in this case. Yes. I don't think that was the subject of specific ruling by the district court, but how does that play into your argument? I don't think that it ultimately plays a significant role in the case, because as we put it in the oil brief, the problem here is not that they pleaded too little, but they pleaded too much. I mean, their allegations are quite candid as to what it is that they're doing here. They don't say that they can, in fact, do any kind of a traceability. They say it all gets filtered through a globally mediated system that mixes everything together and eliminates traceability, and then injuries pop out on the other side. So when you've made that kind of an allegation, everything else that we've argued legally flows from that, and it's not so much an issue that they didn't plead enough facts, and that's why leave to amend would have been futile in this case. Unless the Court has further questions. Further questions?  Thank you, Your Honors. Perhaps going in reverse order, with respect to Iqbal, the facts of global warming are governed by the laws of physics and chemistry, and so we don't think we have a plausibility problem. The defendants themselves admitted in one of their briefs, I think we cited it, that it's not the number of steps in the causal chain, it's whether each one is plausible or not. And clearly, given the laws of chemistry and physics, our highly detailed pleading satisfies that standard. And, you know, we would point, when they say we've pled too much, we point to the facts in Illinois versus Milwaukee. There was a district court bench opinion that we cited in that case where you had, you know, it was clear that there was polluters all over this gigantic watershed encompassing Lake Michigan, two nations, many states, every farm and septic system in the watershed contributed to some small degree to the nutrient pollution that was causing eutrophication of an entire Great Lake. And yet that sort of joint causal contributing factor was enough to allow the case to go to judgment, and then it was ultimately held to be displaced. But it went to judgment and the Seventh Circuit affirmed. On the question of territorial sovereignty, we've alleged in the complaint that our clients owned property. So it doesn't matter that the Alaska Native Claims Settlement Act may have stripped the tribe of what they described. I think it's a misnomer of territorial sovereignty. It stripped them of title of land, but then they reacquired title of the land, of the school, and other pieces of governmental property. So I think that's that would send us down the wrong path. Like Massachusetts, they actually owned the property at issue here. And on the question of parents' patriotic standing, we'd cite the Alaska Supreme Court's decision in the native village of Kuryang, which was a very broad quasi-sovereign interest, Alfred J. Snap, parents' patriotic standing. It wasn't they – because it dealt with the custody of children, they tried to frame it like that old-fashioned version of parents' patriotic, like the State can take custody of one child. That's not what it was. It was a very, very broad holding. I see that I'm out of time. Thank you, Your Honor. Thank you, counsel. Thank you all for your arguments and briefing. It was an excellent presentation by all. And we realize that there are a lot of complicated issues you didn't have time to get to today, but we will – those are well presented in the briefs. Thank you all, and we'll be in recess.
judges: Thomas, Clifton, Pro